# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

KATELYNN MCLIN                                         CIVIL ACTION

VERSUS

TWENTY-FIRST JUDICIAL
DISTRICT, ET AL.                                       NO. 21-00411-BAJ-RLB

## RULING AND ORDER

Before the Court is the second **Motion To Dismiss Under Rule 12 (Doc. 18)** submitted by Defendants the Twenty-First Judicial District ("21st JDC") and Chief Judge Robert H. Morrison, III. Plaintiff opposes Defendants' Motion. (Doc. 21). For reasons set forth herein, Defendants' Motion will be **GRANTED**, and Plaintiff's action will be **DISMISSED WITH PREJUDICE**.

## I.    ALLEGED FACTS

In this action, Plaintiff Katelynn McLin contends that her employer, the 21st JDC, illegally terminated her employment because of her race, and in retaliation for engaging in protected political speech.  Plaintiff asserts similar claims against her "ultimate supervisor," Chief Judge Morrison. For present purposes, the following allegations are accepted as true:

The 21st JDC is one of Louisiana's forty-three judicial districts, and is comprised of the Parishes of Livingston, St. Helena, and Tangipahoa. La. R.S. § 13:477(21). It is conferred by the Louisiana Constitution with original jurisdiction over all civil and criminal matters arising within its boundaries. *See* La. Const. art.

V, §§ 14-16. At the time of the events at issue, Judge Morrison was the Chief Judge of the 21st JDC, tasked by the Constitution with ultimate authority over all "administrative functions prescribed by rule of court." La. Const. art. V, § 17.

Plaintiff identifies as "a 23-year-old, white woman." (Doc. 14 ¶ 20). In October 2019, Plaintiff was hired as a collections officer for the 21st JDC, assigned to work at the Livingston Parish Courthouse. (*Id.* ¶¶ 12, 21, 53). Plaintiff's employment was "at will," and "subject to termination by either the Court or the employee at any time, for any reason not prohibited by law." (*Id.* at ¶¶ 45-46).

Plaintiff performed well in her first year of employment and was selected for a promotion, given a raise, and even awarded a commendation letter. (*Id.* ¶ 23). Yet, despite these accolades, Plaintiff was abruptly fired in November 2020, after her co-workers raised concerns regarding her character and fitness for judicial employment.

The first of these concerns was raised after Plaintiff attended a staff recognition luncheon on Friday, November 13, 2020. (*Id.* ¶ 57). During the luncheon, Plaintiff sat next to "T.D."[1], an African American colleague "with whom she had never spoken." (*Id.* ¶ 59). Plaintiff and T.D. exchanged pleasantries and made small talk throughout lunch. (*Id.* ¶ 60). When it was time to go, Plaintiff said: "Well, time to go back to LP [Livingston Parish] and deal with the LPians." (*Id.* ¶ 61). T.D. questioned what Plaintiff meant by the term "LPian," to which Plaintiff replied: "You know, LPians, us." (*Id.* ¶¶ 63-64). T.D. did not respond, and Plaintiff left the luncheon. (*Id.*

---

[1] Plaintiff's Amended Complaint explains that she identifies her "non-decision-maker" colleagues by their initials only, so as to "protect their privacy." (Doc. 14 ¶ 59 n.5)

¶ 65). Plaintiff explains that, at the time, she believed it was "common slang to refer to Livingston Parish as 'LP' and to refer to the citizens of Livingston Parish as 'LPians,'" and that she did not intend either term to be "offensive, racially charged, or antagonistic in any possible sense." (*Id.* ¶¶ 62, 66).

Evidently, Plaintiff's comments raised T.D.'s interest, such that over the ensuing weekend T.D. conducted an online search of Plaintiff's Facebook account. (*Id.* ¶¶ 73-74). T.D.'s search yielded a public post from June 1, 2020—one week after George Floyd's murder, and during the term of Plaintiff's employment—in which Plaintiff commented on a news article from the *Tulsa World*, Oklahoma's "newspaper of record." (*Id.* ¶ 75). The article itself recounted the story of "a motorist on I-244 who drove his vehicle and horse trailer through a blockade of protestors rallying in the wake of George Floyd's murder causing … 'minor injuries' to two people." (*Id.* ¶ 75). Plaintiff's Facebook post responded to the article as follows:

> All I'm going to say is that Silver Duramax enjoys pulling that black horse trailer at 80mph 🥰 #IWillrunYouOver.

(*Id.* ¶ 76). Plaintiff now justifies her post, stating: "In context, [Plaintiff's] public Facebook post engaged in political and free expression insofar as [Plaintiff] editorialized critique [sic] of the protestors' decision to block incoming Interstate traffic, particularly when doing so put the safety of motorists and animals at risk." (*Id.* ¶ 77).

T.D. reported Plaintiff's November 13 "LPians" comment and Plaintiff's June 1 Facebook post to her supervisor, Judge Blair Edwards, who, in turn, made a complaint to Chief Judge Morrison. (*Id.* ¶¶ 83, 86). Thereafter, on Monday, November

16, 2020, Judge Morrison terminated Plaintiff's employment, citing her Facebook post and her "LPians" comment. (*Id.* ¶¶ 87-94). At Plaintiff's exit interview, Chief Judge Morrison explained: "In today's world that we live in, I have no other choice but to terminate you. You need to watch what you say and do." (*Id.* ¶ 95).

Plaintiff alleges that she "understood Chief Judge Morrison's comment to mean that his decision to terminate [her] was because of her race, the political content of her Facebook post, her use of the word 'LPian' in the context of her race and T.D.'s race, and a perception of her political beliefs or political-party affiliation." (*Id.* ¶ 96). To the point, Plaintiff believes that "Chief Judge Morrison would not have terminated [her] employment had she not been white," and had she "not engaged in political speech via Facebook." (*Id.* ¶¶ 97, 99). Plaintiff further states her "belief" that other 21st JDC employees (including T.D.) were engaged in similar public commentary, yet were not terminated or otherwise disciplined. (*Id.* ¶¶ 104-107). Despite these "beliefs," however, Plaintiff fails to specifically identify any other instances when a 21st JDC employee used the term "LPian" *or* made a similar Facebook post. (*See id.*).

Plaintiff alleges that she suffered economic and reputational damages as a result of her termination, and has struggled to find re-employment due to "significantly diminished" credibility. (*Id.* ¶¶ 124-126).

## II.    PROCEDURAL BACKGROUND

On April 14, 2021 Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that the 21st JDC unlawfully terminated her based on her race in violation of Title VII. (Doc. 14 ¶ 17).

4

On April 20, 2021, the EEOC issued Plaintiff a right to sue letter. (*Id.* at ¶ 18). Thereafter, on July 28, 2021, Plaintiff initiated this action against the 21st JDC and Chief Judge Morrison (in his personal capacity *only*). (Doc. 1).

Plaintiff's First Amended, Restated, and Superseding Complaint asserts four claims: (1) disparate treatment on the basis of Plaintiff's race in violation Title VII, against the 21st JDC (Doc. 14 ¶¶ 128-135); (2) disparate treatment on the basis of Plaintiff's race in violation of 42 U.S.C. § 1981, against Chief Judge Morrison (*id.* ¶¶ 136-142); (3) unlawful termination for "political activity" in violation of La. R.S. § 23:961, against the 21st JDC (*id.* ¶¶ 143-150); and (4) unlawful termination in retaliation for engaging in protected speech in violation of the First Amendment to the U.S. Constitution, against Chief Judge Morrison (*id.* ¶¶ 151-157).

Now Defendants jointly seek dismissal of Plaintiff's action, asserting that the Court lacks subject matter jurisdiction over Plaintiff's claims against the 21st JDC, that, in any event, Plaintiff's claims fail as a matter of law because her allegations do not establish their essential elements, and that Plaintiff's claims against Judge Morrison are barred by qualified immunity. (Doc. 18). Plaintiff opposes Defendants' Motion. (Doc. 21).

### III.   ANALYSIS

As it must, the Court addresses the 21st JDC's jurisdictional arguments first.

#### A. Rule 12(b)(1) Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(1), a claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim. *In re FEMA Trailer Formaldehyde*

*Prods. Liab. Litig.*, 668 F.3d 281, 286–287 (5th Cir. 2012). A court should consider a Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id.*

### i. The 21st JDC Lacks Capacity To Be Sued

The 21st JDC argues that it is not "a juridical person capable of being sued under the Federal Rules and Louisiana law." (Doc. 18-1 at p. 12). Under Rule 17(b), Louisiana law determines whether a party maintains capacity to be sued. Fed. R. Civ. P. 17(b)(3). And, under Louisiana law, judicial districts lack capacity to be sued. *See, e.g., Laugand v. Bank of New York Mellon*, No. 17-cv-00083, 2017 WL 4276474, at *2 (M.D. La. Sept. 26, 2017) (Jackson, J.) (dismissing plaintiff's claims against the 19th Judicial District Court (citing authorities)). Consistent with this well-established authority, Plaintiff's claims against the 21st JDC will be dismissed.

Plaintiff strains to distinguish her case from this established authority, insisting that even if Louisiana law prohibits claims against a judicial district *court*, it does *not* prohibit claims against the *judicial district* itself. (Doc. 21 at pp.7-19). The Court is not persuaded. Indeed, Plaintiff's argument is foreclosed by the Louisiana Supreme Court, which counsels as follows:

> The important determination with respect to the juridical status or legal capacity of an entity is not its creator, nor its size, shape, or label. Rather the determination that must be made in each particular case is whether the entity can appropriately be regarded as an additional and separate government unit for the particular purpose at issue. In the absence of positive law to the contrary, a local government unit may be deemed to be a juridical person separate and distinct from other government entities, when the organic law grants it the legal capacity to function independently and not just as the agency or division of another governmental entity.

*Roberts v. Sewerage & Water Bd. of New Orleans*, 634 So. 2d 341, 346–47 (La. 1994).

Significantly, the Louisiana Constitution draws no distinction between a judicial district and the district court(s) located within its boundaries. *See* La. Const. art. V, § 14 ("The state shall be divided into judicial districts, each composed of at least one parish and served by at least one district judge."); *see also id.* art. V, §§ 15-16). The upshot is that the judicial district court is part-and-parcel of the judicial district it serves. Obviously, neither the judicial district nor the judicial district court could function independently of the other. And because the law is settled that a judicial district court may *not* be sued, *see Laugand*, 2017 WL 4276474, at *2, it necessarily follows that the judicial district itself also may not be sued, *Roberts*, 634 So. 2d at 346–47.[2]

Having determined that the 21st JDC lacks capacity to be sued, the Court dismisses Plaintiff's claims on this basis alone, and does not address the 21st JDC's alternative argument that Eleventh Amendment sovereign immunity bars Plaintiff's

---

[2] In a last ditch effort, Plaintiff argues that the U.S. Constitution's Supremacy Clause enables her to pursue at least her Title VII claims against the 21st JDC, reasoning that "no [qualifying] employer is beyond the reach of Title VII under substantive federal law, and any conflicting Louisiana state law that purports to deprive Title VII of jurisdiction over a discriminating employer is preempted as a matter of federal supremacy." (Doc. 21 at p 15). Plaintiff paints this argument only in the broadest strokes, without citing even one case holding that the Supremacy Clause supersedes Louisiana law establishing that a state court lacks capacity to be sued. On the other hand, Defendants do not address Plaintiff's argument in their reply brief.

Again, the Court is not convinced by Plaintiff's position. As a general rule, the Supremacy Clause requires that state law must give way to federal law only when state and federal law "directly conflict." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011). Here, there is no direct conflict of laws; rather, the *federal* rules merely dictate that state law determines what entities may be sued under Title VII. Fed. R. Civ. P. 17(b)(3).

Regardless, even if the Court *assumes* that the Supremacy Clause somehow supplants Louisiana law and that the 21st JDC *is* capable of being sued under Title VII, Plaintiff's Title VII claim fails on the merits, for the reasons set forth below. *See* Section III(B)(i), *infra*.

claim under La. R.S. § 23:961.

### B.    Rule 12(b)(6) Standard

Plaintiff's remaining claims target Chief Judge Morrison, in his individual capacity. Defendants seek dismissal of these claims under Rule 12(b)(6). Alternatively, Defendants assert that Chief Judge Morrison is entitled to qualified immunity.

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

### i. Plaintiff Fails To Plausibly Allege That She Was Treated Differently From Any Other Co-Workers

Plaintiff contends that Chief Judge Morrison unlawfully fired her due to her race.[3] Plaintiff does not allege any direct evidence of Judge Morrison's discriminatory motive—*i.e.*, a "statement or written document showing a discriminatory motive on its face," *see Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994)—and therefore must prove her case through circumstantial evidence, according to the burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To make a prima facie case of discriminatory discharge, Plaintiff must plausibly allege that she: "(1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (quotation marks omitted).

Plaintiff satisfies the first three elements of her claim: she belonged to a

---

[3] Plaintiff pursues race-based termination claims under both 42 U.S.C. § 1981 (against Chief Judge Morrison) *and* Title VII (against the 21st JDC). The distinction is without difference, however, because "retaliation claims under § 1981 and Title VII are parallel causes of action, which means they require proof of the same elements in order to establish liability." *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) (quotation marks and alterations omitted)). As such, the Court addresses Plaintiff's race-based termination claims according to the elements generally required to establish Defendants' liability, without specific citation to the various sources of law. Further, because the elements are the same, the analysis set forth in this section applies equally to the merits of Plaintiff's race-based termination claims against Chief Judge Morrison *and* the 21st JDC.

protected class (white), excelled at her position, and was nonetheless fired. Still, as noted in Defendants' dismissal papers, (*see* Doc. 18-1 at p. 16), Plaintiff falters at the fourth element because she has not plausibly alleged any differential treatment, which requires allegations establishing that a "similarly situated" comparator was *not* fired despite committing nearly the same misconduct. *See Okoye*, 245 F.3d at 514 To the point, Plaintiff must allege the existence of at least one non-white co-worker working in "nearly identical circumstances" that maintained her job after demonstrating the same character and fitness concerns ascribed to Plaintiff. *See id.* ("[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical' circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." (quotation marks and alterations omitted)).

Notably, in this regard, Plaintiff's allegations sink to the realm of suspicion and innuendo. Specifically, Plaintiff states:

> 104. Upon information and belief, other 21st JDC employees publicly discuss topics and political issues that concern or adjacent to politics and social justice, and these employees have these discussions both face to face and online.

> 105. Upon information and belief, at least some of these other 21st JDC employees are not white and have not been terminated or reprimanded in written or verbal form.

> 106. Specifically, upon information and belief, the complainant T.D. (and upon information and belief others) has posted political endorsements online and via Facebook that presumably violate the 21st JDC policy prohibiting such public political endorsements.

> 107. Upon information and belief, T.D. (and upon information and belief

others) has not been terminated or reprimanded in written or verbal form for these express violations of 21st JDC's social media policies.

(Doc. 14 at ¶¶ 104-107).

As a rule, an "information and belief" allegation cannot stand on its own; rather, it must be accompanied by sufficient additional detail to make the allegation "plausible on its face." *See Twombly*, 550 U.S. at 551, 557 (rejecting plaintiff's conclusory "information and belief" allegation that the defendants had entered into a conspiracy absent additional facts to make that allegation plausible); *see also Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 525 (S.D. Tex. 2009) (Miller, J.) ("In *Twombly*, the plaintiffs based one of their allegations (that the defendants had entered into an anti-competitive conspiracy) 'upon information and belief,' and the Supreme Court held that this allegation, without more, failed to provide sufficient facts "to state a claim to relief that is plausible on its face."), *aff'd* 631 F.3d 777 (5th Cir. 2011). "Moreover, ... allegations based upon information and belief are particularly inappropriate in cases where the allegations are based on matters of public record." *Funk*, 673 F. Supp. 2d at 525.

Here, Plaintiff alleges that she alone was singled out for using the term "LPians" to describe the citizens served by the 21st JDC, and for crudely threatening to "run over" protesters marching in the wake of the George Floyd murder. Yet, Plaintiff fails to specify *any* instance when other employees engaged in similar conduct, and posits merely her "belief" that other such instances must have occurred. Judicial experience and common sense dictate that an employee with 13 months' workplace experience *and* a demonstrated ability to navigate Facebook should be able

11

to identify with *some* certainty at least *one* occasion when a co-worker used slang to describe the 21st JDC's constituents, or used Facebook to sound off regarding the George Floyd protestors (or any other matter of public concern). *See Iqbal*, 556 U.S. at 678. Such statements are essentially "matters of public record," easily accessible to Plaintiff to the extent they *exist. Funk*, 673 F. Supp. 2d at 525.

In short, Plaintiff's reliance upon mere "information and belief" allegations to establish that others engaged in similar activities but were not fired renders her race-based termination claim facially implausible. *Iqbal*, 556 U.S. at 678; *cf. Twombly*, 550 U.S. 551, 570 (plaintiffs' "information and belief" allegation, without more, failed to plausibly establish that defendants had entered into an anti-competitive conspiracy); *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (plaintiff's "information and belief" allegation, without more, failed to plausibly establish that Florida possessed only expired, illegally obtained, or compounded pentobarbital); *Howard v. ABN AMRO Mortg. Grp., Inc.*, No. 13-cv-543, 2014 WL 1237317, at *3 (S.D. Miss. Mar. 26, 2014) (Starrett, J.) (plaintiff's "information and belief" allegation, without more, failed to plausibly establish the existence of an indemnity agreement among the defendants); *Irons v. City of Dallas*, No. 3:11-cv-1894, 2012 WL 1986585, at *4 (N.D. Tex. Apr. 4, 2012) (Stickney, M.J.) (plaintiffs' "information and belief" allegations, without more, failed to plausibly establish the existence of prior false arrests and other police misconduct).

Having failed to satisfy the elements of her prima facie case, Plaintiff's claim

of discriminatory discharge against Chief Judge Morrison must be dismissed.[4]

> ### ii. Qualified Immunity Defeats Plaintiff's First Amendment Retaliation Claim Against Chief Judge Morrison

Finally Plaintiff contends that Chief Judge Morrison unlawfully fired her after she engaged in protected political speech—specifically, her Facebook post. In response, Judge Morrison invokes qualified immunity. (Doc. 18-1 at pp. 19-21).

Qualified immunity shields a government official from liability "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019). Its intended purpose is to strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties" by making it possible for government officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Put differently, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S.

---

[4] Having determined that Plaintiff's race-based unlawful discharge claim fails on the merits, the Court has no need to consider whether Chief Judge Morrison is entitled to qualified immunity on this claim. Further, as indicated above, *supra* n.3, the foregoing merits analysis applies equally to Plaintiff's race-based unlawful discharge claim against the 21st JDC. In short, whether pursued under 42 U.S.C. § 1981 (against Chief Judge Morrison) or Title VII (against the 21st JDC), Plaintiff's race-based discharge claim fails because she cannot show any unfavorable treatment vis-à-vis her non-white colleagues.

731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Fifth Circuit's two-pronged test for qualified immunity asks (1) "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional [or statutory] right," and (2) "whether the right was 'clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020). A court may analyze these prongs in either order, and resolve the case on a single prong. *Id.* at 190. Importantly, "[a]lthough nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).

> To prevail on a § 1983 First Amendment retaliation claim, a public employee must establish the following: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action.

*Modica v. Taylor*, 465 F.3d 174, 179–80 (5th Cir. 2006) (quotation marks and citations omitted). Here, Plaintiff's allegations satisfy the first, second, and fourth elements of her claim: she was fired after making a crude public Facebook post regarding a matter of public concern (the George Floyd protests), and "Chief Judge Morrison admitted that his decision to terminate [Plaintiff] was based on [her] Facebook post." (Doc. 14 ¶ 94).

This leaves the third element—specifically, whether Plaintiff's interest in commenting on the George Floyd protests outweighed Chief Judge Morrison's constitutional duty to promote the efficient operation of the 21st JDC.

> To determine whether a plaintiff's interest in speech outweighs the
> government's interest in promoting efficiency, we consider "whether the
> statement impairs discipline by superiors or harmony among co-
> workers, has a detrimental impact on close working relationships for
> which personal loyalty and confidence are necessary, or impedes the
> performance of the speaker's duties or interferes with the regular
> operation of the enterprise."

*Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) (quoting *Rankin v.
McPherso*n, 483 U.S. 378, 388 (1987)), *abrogated on other grounds by Sims v. City of
Madisonville*, 894 F.3d 632 (5th Cir. 2018). Additionally, the Court properly considers
"the degree to which the employee's activity involved a matter of public concern," "the
time, place, and manner of the employee's activity," and "whether the employee's
activity may be characterized as hostile, abusive, or insubordinate." *Brady v. Fort
Bend Cnty.*, 145 F.3d 691, 707 (5th Cir. 1998). The Court balances these
considerations below, mindful of the axiomatic truth—set forth eloquently by the
Louisiana Supreme Court—that "the judicial branch depends upon the confidence of
the people it serves. Without that necessary confidence, the judiciary cannot serve its
paramount purpose of providing a fair and impartial open forum in which the public
may resolve its disputes." *In re Benge*, 2009-1617 (La. 11/6/09), 24 So. 3d 822, 845.

First, plainly, Plaintiff's post involved a matter of public concern. In the wake
of George Floyd's murder, hundreds of protests erupted around the country, many of
which included rallies and marches that disrupted interstate traffic. Certainly,
divergent views exist regarding the propriety of a protest that interferes with
interstate travel.

Second, however, Plaintiff's post did not contribute anything meaningful to the
public discourse regarding the protestors' tactics. Indeed, Plaintiff's assertions that

her Facebook post "editorialized" the *Tulsa World* article, and "offered a critique of the protestors' decision to block incoming Interstate traffic," are unpersuasive. (Doc. 21 at p. 4). Rather, Plaintiff's post may indeed be characterized as overtly hostile and abusive:

> All I'm going to say is that Silver Duramax enjoys pulling that black horse trailer at 80mph 🥴 #IWillrunYouOver."

(Doc. 14 ¶ 76). The post provides no analysis or opportunity for dialogue. It issues a threat: "#IWillrunYouOver."

Third, the timing, placement, and manner of Plaintiff's post was optimized to invoke outrage, and to undermine public confidence in the impartiality of the 21st JDC on the issue of protesters' tactics. Plaintiff made her post on June 1, 2020, one week after George Floyd was killed, six days after the video of George Floyd's death was originally released, and two days after Officer Derek Chauvin was arrested and charged with murder, just as courts around the country were being asked to adjudicate cases involving protestors' tactics and officials' responses to the same.[5]

---

[5] *E.g., inter alia, Sasso v. City of Dallas*, No. 20-cv-1398, 2020 WL 2839217, at *4 (N.D. Tex. June 1, 2020) (declining plaintiff-protestor's request for a temporary restraining order (TRO) blocking enforcement of Dallas's curfew imposed to quell vandalism, looting, and violence coinciding with the George Floyd protests); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1294 (D. Colo. June 5, 2020) (granting plaintiff-protestors' request for a TRO prohibiting Denver's Police Department from employing chemical weapons or projectiles against persons engaging in peaceful protests or demonstrations); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1157 (D. Or. June 9, 2020) (granting plaintiff-protestors' request for a TRO prohibiting Portland's Police Department from using tear gas unless "lives or safety of the public or the police are at risk"); *Goyette v. City of Minneapolis*, No. 20-cv-1302, 2020 WL 3056705, at *3, 6 (D. Minn. June 9, 2020) (denying plaintiff-reporters' request for a TRO enjoining Minneapolis Police Department "from arresting and threatening members of the news media, and from using chemical irritants or physical force … against members of the news media"); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1216 (W.D. Wash. June 12, 2020) (granting plaintiff-protestor's request for a TRO prohibiting Seattle's Police Department from "employing chemical irritants or

Plaintiff did not make her post "private," or even limit her post to her Facebook "friends"; instead, she made her post "public," available to anyone capable of conducting an internet search. (Doc. 14 ¶¶ 72-74). And, again, Plaintiff's remarks most certainly may be characterized as overtly hostile. It is one thing to articulate a disagreement with protesters' methods, it is quite another to publicly state "#IWillrunYouOver."

Fourth, Plaintiff's *own* allegations establish that her post weakened workplace morale and impaired harmony among co-workers. Otherwise, why would "T.D." have reported the post to her supervisor (Judge Edwards) who, in turn made a complaint to Chief Judge Morrison?

Fifth, and perhaps most important, Plaintiff's post jeopardized the regular operation of the 21st JDC. Again, the "judicial branch depends upon the confidence of the people it serves," without which it "cannot serve its paramount purpose of providing a fair and impartial open forum in which the public may resolve its disputes." *In re Benge*, 24 So. 3d at 845. This confidence is threatened not just by "actual partisanship"; even the mere "appearance of partisanship in the administration of justice" undermines the judicial branch's mission. *See Brazil-Breashears v. Bilandic*, No. 93-6589, 1993 WL 496682, at *4 (N.D. Ill. Nov. 29, 1993) (Williams, J.)

> More than the legislative and executive branches of government, public confidence in the integrity of the judicial branch depends on its ability to distance itself from the political arena, and resolve legal disputes on a wholly impartial basis. Absent appropriate safeguards restricting

_____

projectiles of any kind against persons peacefully engaging in protests or demonstrations").

public political activity by judicial employees, public faith in the court
system and ultimately, its effectiveness could be undermined.

*Id.* Plaintiff's crude post undermines this confidence by reflecting an intentional and violent disregard for the lives and rights of protesters engaged in civil disobedience. At the time she made her post, it was not hard to imagine that litigation involving protestors' tactics would also arise within the 21st JDC. In such circumstances, anyone reading Plaintiff's post would question whether Plaintiff, a judicial employee, could carry out her duties fairly and impartially. Such questioning would necessarily extend to her employer—the 21st JDC itself—thereby undermining the court's "paramount purpose of providing a fair and impartial open forum." *In re Benge*, 24 So. 3d at 845. Chief Judge Morrison, whose Constitutional duty was to protect the fair administration of justice and maintain confidence in the 21st JDC, determined that Plaintiff's public post undermined the 21st JDC's "paramount purpose," and lawfully fired Plaintiff as a result.

In sum, the overwhelming weight of the relevant factors point to one result: Plaintiff cannot rebut Chief Judge Morrison's qualified immunity defense because she cannot show that her interest in a crude Facebook post outweighed Judge Morrison's constitutional duty to ensure the fair, impartial, and efficient administration of justice within the 21st JDC. *See* La. Const. art. V, § 17. Having failed to show a violation of her constitutional rights, Plaintiff's First Amendment retaliation claim must be dismissed.[6]

---

[6] Because Plaintiff cannot show a First Amendment violation, the Court dismisses on this prong of the qualified immunity analysis alone, and does not reach the issue of whether Plaintiff's rights were "clearly established" when she was fired. *See Cunningham*, 983 F.3d

## IV.    AMENDMENT

When a complaint fails to state a claim, the Court should generally give the plaintiff a chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir.2002) ("district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable"); *see also Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) ("Rule 15(a) requires a trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend." (internal quotations omitted)).

Here, Plaintiff has already amended her complaint once, in direct response to Defendants' original motion to dismiss. (*See* Docs. 1, 9, 14). Notably, Plaintiff's opposition papers do not include a request to amend the substance of her claims again, indicating that she has put her best foot forward. In any event, the Court determines that further amendment would be futile because, as set forth herein, the 21st JDC lacks capacity to be sued, and because Plaintiff has already tried and failed to allege facts capable of overcoming Chief Judge Morrison's individual defenses, including qualified immunity. As such, the Court will dismiss Plaintiff's action with prejudice, without granting leave to amend.

## V.    CONCLUSION

Accordingly,

---

at 190-91.

**IT IS ORDERED** that Defendants' **Motion To Dismiss Under Rule 12 (Doc. 18)** be and is hereby **GRANTED** as set forth herein.

**IT IS FURTHER ORDERED** that Plaintiff's action be and is hereby **DISMISSED WITH PREJUDICE**.

Final judgment shall issue separately.

Baton Rouge, Louisiana, this 13th day of July, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**